IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

LESLIE A. G.,

                     Plaintiff,

      v.                           Civil Action No.
                                    1:21-CV-0408 (LEK/DEP)

KILOLO KIJAKAZI, Acting Commissioner
of Social Security,[1]

                     Defendant.

_____

APPEARANCES:                OF COUNSEL:

FOR PLAINTIFF

THE DEHAAN LAW FIRM, P.C.      JOHN W. DEHAAN, ESQ.
300 Rabro Drive, Suite 101
Hauppauge, NY 11788

FOR DEFENDANT

SOCIAL SECURITY ADMIN.       MICHAEL L. HENRY, ESQ.
625 JFK Building
15 New Sudbury St
Boston, MA 02203

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

_____

[1]     Plaintiff's complaint named Andrew M. Saul, in his official capacity as the
Commissioner of Social Security, as the defendant. On July 12, 2021, Kilolo Kijakazi
took office as the Acting Social Security Commissioner. She has therefore been
substituted as the named defendant in this matter pursuant to Rule 25(d)(1) of the
Federal Rules of Civil Procedure, and no further action is required in order to effectuate
this change. *See* 42 U.S.C. § 405(g).

REPORT AND RECOMMENDATION

Plaintiff has commenced this proceeding, pursuant to 42 U.S.C. §

405(g), to challenge a determination of the Commissioner of Social

Security ("Commissioner") finding that she was not disabled at the relevant

times and, accordingly, is ineligible for the disability insurance benefits

("DIB") for which she has applied.  The matter has been referred to me for

the issuance of a report and recommendation, pursuant to 28 U.S.C. §

636(b) and Northern District of New York Local Rule 72.3.  For the reasons

set forth below, I recommend a finding that the Commissioner's

determination resulted from the application of proper legal principles and is

supported by substantial evidence.

I.    BACKGROUND

Plaintiff was born in April of 1976, and is currently forty-six years of

age.  She was thirty-five years old as of March 8, 2012, the date upon

which she allegedly became disabled, and thirty-eight years old at the time

of her application for benefits in October of 2014.  Plaintiff stands five feet

and one inch in height, and weighed approximately one hundred thirty-five

pounds at the relevant times.  At the times relevant to her current appeal,

plaintiff lived with both her husband, who is disabled, and her two

daughters, in Schenectady, New York.

2

Plaintiff reports that she did not graduate from high school and that, although she attempted to obtain a GED twice, she was unsuccessful in that endeavor.  She previously worked as a tax aide for New York State, in which job she filled missing information into tax forms and performed filing duties.

Plaintiff alleges that she suffers primarily from pain and other issues related to her cervical spine and neck, although she also complains of mental impairments such as bipolar disorder, depression, anxiety, and attention deficit hyperactivity disorder ("ADHD").  Plaintiff treated for her conditions during the relevant period with Dr. Paul Spurgas and others at Ellis Neurosurgery, physical therapists at Ellis Hospital, and Dr. Ephraim Back at Ellis Primary Care.  Plaintiff also treated after the relevant period with other sources including psychiatric nurse practitioner ("NP") Tammy LeBlanc at the Center for Solutions, and Dr. KrisEmily McCrory, who took over plaintiff's treatment from Dr. Back in late 2013 at Ellis Primary Care.

Physically, plaintiff claims to suffer primarily from limitations related to her cervical spine.  She underwent anterior discectomy and fusion surgery on her cervical spine in or about March 2012, which initially helped alleviate some of the numbness in her hands and feet, but did not relieve her pain.  She reports that her neck is still very stiff and she has difficulty with

walking, standing, bending, sitting and lifting.  Her medications reduce the

pain somewhat, but they make her feel drowsy and sleepy.  Plaintiff also

reports experiencing mental health issues, which cause depression and

difficulty being around too many people.

In terms of activities, plaintiff reports that she can cook, perform

household chores, wash laundry, shop with her daughter, and handle most

of her personal care independently, although she needs help washing her

hair because of neck pain.

## II.    PROCEDURAL HISTORY

### A.    Proceedings Before the Agency

Plaintiff applied for DIB payments under Title II of the Social Security

Act on October 29, 2014.  In support of her application, she claimed to be

disabled due to bipolar disorder, anxiety, depression, ADHD, and bulging

discs and arthritis in her neck.

An initial hearing was conducted on December 20, 2016, by

Administrative Law Judge ("ALJ") Dale Black-Pennington to address

plaintiff's application.  ALJ Black-Pennington conducted a follow-up hearing

on June 6, 2017, at which he elicited testimony from two medical experts

regarding plaintiff's physical and mental functioning.  Following that

hearing, ALJ Black-Pennington issued a partially favorable decision on July

13, 2017, finding that plaintiff was disabled from March 8, 2012, through March 17, 2013, at which time she experienced medical improvement and was no longer disabled.  On July 15, 2019, the Social Security Appeals Council ("Appeals Council") granted review of that decision, which it vacated, and the matter was remanded for reconsideration and further development of the record to enable an appropriate assessment of whether plaintiff had become disabled again at any point after the date on which she was last insured ("DLI").[2]  AT 170-71.

On remand, ALJ John T. Molleur held a third hearing on April 2, 2020, after which he issued an unfavorable decision, finding that plaintiff was not disabled at any point during the relevant period between March 8, 2012, and December 31, 2012.  That opinion became a final determination of the agency on February 18, 2021, when the Appeals Council denied plaintiff's request for review of the ALJ's decision.

B.    The ALJ's Decision

In his decision, ALJ Molleur applied the familiar, five-step sequential

---

[2]    Specifically, because plaintiff filed her application for benefits in October of 2014, the period during which she had been found to be disabled by ALJ Black-Pennington ended more than twelve months before she filed her application, and thus did not comply with the agency's regulations that require that an application for a period of disability be filed no later than twelve months after the month in which the disability ended.  AT 304.  As a result, plaintiff would have needed to show that she became disabled again at some time after her DLI in order be entitled to benefits based on her application.

test for determining disability.  At step one, he found that plaintiff did not

engage in substantial gainful activity during the relevant period.  The ALJ

next found at step two that plaintiff suffered from a medically determinable

impairment of degenerative disc disease of the cervical spine with anterior

cervical discectomy and fusion at C5-C6 and C6-C7 that imposed more

than minimal limitations on her ability to perform basic work functions

during the relevant period.  The ALJ additionally found that plaintiff's

alleged impairments of hypertension, insomnia, major depressive disorder,

generalized anxiety disorder, and posttraumatic stress disorder ("PTSD")

were not severe impairments during the relevant period.

At step three, ALJ Molleur examined the governing regulations of the

Commissioner setting forth presumptively disabling conditions (the

"Listings"), *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, and concluded that

plaintiff's conditions did not meet or medically equal any of the listed,

presumptively disabling conditions set forth in the Commissioner's

regulations, specifically considering Listing 1.04.  In that regard, the ALJ

found that the opinion from medical expert Dr. Arthur Lorber that plaintiff

met Listing 1.04 from March 8, 2012, to March 17, 2013, was entitled to

little weight because it was based on an incomplete record and inconsistent

with the testing and clinical findings showing plaintiff did not receive

treatment for her neck from July 2012 through the remainder of the relevant period.

ALJ Molleur next surveyed the available record evidence and concluded that plaintiff retains the residual functional capacity ("RFC") to perform a range of work at the light exertional level with the following additional limitations:

> she was unable to climb ladders, ropes, or scaffolds but could have performed other postural activities no more than occasionally. She could perform frequent pushing and pulling with both upper extremities and occasional overhead reaching with upper extremities and frequent reaching in all other directions with both upper extremities. She should have avoided work at unprotected heights with no contact with higher concentration of vibrations. The claimant was able to lift and carry no more than 10 pounds occasionally.

ALJ Molleur went on to step four and elicited the testimony of a vocational expert regarding how plaintiff's limitations would impact her ability to perform her past relevant work as a checker/tax aide and concluded, in light of that testimony, that plaintiff remained able to perform in that position. ALJ Molleur further found, based on the testimony of the vocational expert, that, even if plaintiff was precluded from performing her past relevant work, there existed significant numbers of other jobs in the national economy that plaintiff could perform, citing as representative examples the positions of cashier, outside deliverer, and price marker.

Based upon these findings, ALJ Molleur concluded that plaintiff was not disabled during the relevant time period.

#### C.    This Action

Plaintiff commenced this action on April 12, 2021.[3]  In support of her challenge to the ALJ's determination, plaintiff argues that (1) the ALJ erred in finding that her mental impairments were not severe during the relevant period, and in improperly rejecting the medical source statement provided by NP LeBlanc, who treated plaintiff; (2) the ALJ failed to properly evaluate the medical evidence and to support his findings with substantial evidence, in that he rejected all of the medical opinions of record and instead substituted his own lay interpretation of the evidence; and (3) the ALJ failed to properly assess plaintiff's subjective reports according to the governing regulations.  Dkt. No. 14.

Oral argument was conducted in this matter, by telephone, on August 3, 2022, at which time decision was reserved.

### III.    DISCUSSION

#### A.    Scope of Review

---

[3]    This action is timely, and the Commissioner does not argue otherwise.  It has been treated in accordance with the procedures set forth in General Order No. 18. Under that General Order, the court treats the action procedurally as if cross-motions for judgment on the pleadings have been filed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

A court's review under 42 U.S.C. § 405(g) and 1383(c)(3) of a final decision by the Commissioner is subject to a "very deferential" standard of review, and is limited to analyzing whether the correct legal standards were applied, and whether the decision is supported by substantial evidence. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Where there is reasonable doubt as to whether an ALJ has applied the proper legal standards, the decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). If, however, the correct legal standards have been applied, and the ALJ's findings are supported by substantial evidence, those findings are conclusive, and the decision will withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact. *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *see also* 42 U.S.C. § 405(g).

The term "substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 390, 401 (1971) (quoting

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord, Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003).  To be substantial, there must be "more than a mere scintilla" of evidence scattered throughout the administrative record.  *Richardson*, 402 U.S. at 401 (internal quotation marks omitted); *Williams*, 859 F.3d at 258.  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis on the substantiality of the evidence must also include that which detracts from its weight."  *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *Mongeur v. Hechler*, 722 F.2d 1033, 1038 (2d Cir. 1983)).

    B.    <u>Disability Determination: The Five-Step Evaluation Process</u>

    The Social Security Act ("Act") defines "disability" to include the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).  In addition, the Act requires that a claimant's

> physical or mental impairment or impairments [be] of
> such severity that he is not only unable to do his
> previous work but cannot, considering his age,
> education, and work experience, engage in any other

> kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

The agency has prescribed a five-step evaluative process to be employed in determining whether an individual is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. The first step requires a determination of whether the claimant is engaged in substantial gainful activity ("SGA"); if so, then the claimant is not disabled, and the inquiry need proceed no further. *Id.* §§ 404.1520(b), 416.920(b). If the claimant has not worked at a level constituting SGA, then the second step involves an examination of whether the claimant has a severe impairment or combination of impairments that significantly restricts his or her physical or mental ability to perform basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations. *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1. If so, then the claimant is "presumptively disabled." *Martone v. Apfel*, 70 F. Supp. 2d 145, 149 (N.D.N.Y. 1999) (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(e), (f), 416.920(e), (f). If it is determined that it does, then as a final matter, at step five the agency must examine whether the claimant can do any other work. *Id.* §§ 404.1520(g), 416.920(g).

The burden of showing that the claimant cannot perform past work lies with the claimant. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584. Once that burden has been satisfied, however, it becomes incumbent on the agency to prove that the claimant is capable of performing other available work. *Perez*, 77 F.3d at 46. In deciding whether that burden has been met, the ALJ should consider the claimant's RFC, age, education, past work experience, and transferability of skills. *Ferraris*, 728 F.2d at 585; *Martone*, 70 F. Supp. 2d at 150.

C.     Analysis

Because plaintiff's application in this case was filed in 2014, the procedures for weighing opinion evidence found in 20 C.F.R. § 404.1527, which have since been amended, apply to her claim. Under those regulations, if the source is a treating physician, an ALJ is required to consider whether that opinion is entitled to controlling weight, or, if not,

12

what degree of weight any such medical opinion is otherwise entitled to by considering factors such as (1) the frequency, length, nature, and extent of treatment, (2) the amount of medical evidence or explanation supporting the opinion, (3) the consistency of the opinion with the remaining medical evidence, and (4) whether the physician is a specialist. *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019). Although the failure to explicitly consider all of the above factors is a procedural error, the Second Circuit acknowledged that, so long as the agency has provided "good reasons" for the weight assigned to a treating physician's opinion and "a searching review of the record assures [the court] that the substance of the treating physician rule was not traversed," the agency's finding should be affirmed. *Estrella*, 925 F.3d at 96. However, when weighing opinion evidence, statements that a claimant is "disabled" or "unable to work" are not given any special significance or deference under the regulations because the determination of whether a claimant is disabled is an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(d).

As was discussed above, because this is a Title II case,[4] plaintiff is

---

[4]    At oral argument, plaintiff raised the fact that the record contains evidence that she filed a Title XVI application concurrent with the relevant Title II application. Administrative Transcript ("AT") at 402. Although it is not clear what the resolution of that Title XVI application was, the state agency determination in which plaintiff's claim was denied at the initial level explicitly applies only to her Title II application. AT 134 (noting the decision is for her "DIB" claim). Further, the ALJ decisions from both ALJ

required to establish that any disability began during the period between

March 8, 2012, and December 31, 2012, and that, due to the

circumstances of her application filing date, any such disability continued or

reoccurred through a period that was twelve months or less before October

29, 2014.  20 C.F.R. § 404.621(c).

### 1.  Plaintiff's Mental Impairments

Plaintiff first argues that the ALJ erred in failing to find that her mental

impairments were severe at step two of the sequential evaluation during

the relevant period.  Plaintiff appears to acknowledge that she did not

receive any treatment from a mental health care professional during the

relevant period, but argues that the ALJ (1) ignored her statements related

to her application for benefits that she had been prescribed mental health

medications before 2013, and that she had been experiencing anxiety her

whole life that worsened in 2012, (2) failed to account for the fact that

records from the relevant period showed that she was prescribed

Cymbalta, which she argues is "a clear indication that [Dr. Back] had

---

Black-Pennington and ALJ Molleur addressed only plaintiff's Title II claim.  AT 10-20,
145-61.  Because plaintiff's Title XVI application does not appear to have been decided
as part of any of underlying procedural history of the case now before me, there is no
evidence to suggest that application is at issue in this appeal.  I note, moreover, that
because it does not appear that plaintiff has challenged the omission of that application
during any step of the process up until oral argument, any such argument now raised is
deemed to have been waived.

14

diagnosed her with depression", and (3) failed to acknowledge that NP LeBlanc's evaluation in February of 2013 indicated that she had previously been prescribed medications such as Paxil, Zoloft, Effexor, Prozac, and Trazadone.  Dkt. No. 14, at 33-34.

As to plaintiff's first argument, the ALJ did not err in failing to credit her later subjective reports that she had in fact been experiencing mental health issues during the relevant period because, as will be discussed in greater detail below in another section of this report and recommendation, the ALJ's assessment of plaintiff's subjective reports, which he found not to be wholly consistent with the evidence in the record, is supported by substantial evidence.  Most notably, the ALJ correctly observed that plaintiff did not seek formal mental health treatment prior to her DLI, and that, with the exception of a report in November of 2012 that was shown to be due to an adverse reaction to the Lyrica she was taking for her physical symptoms, treatment notes from the relevant period do not show any psychiatric symptoms during the relevant period.  Administrative Transcript ("AT") at 12-13, 770-73 (indicating that plaintiff was experiencing personality changes that resolved when she stopped taking Lyrica).[5]  The

---

[5]     The administrative transcript is found at Dkt. No. 9, and will be referenced throughout this decision as "AT __."

ALJ therefore was not required to accept wholesale plaintiff's reports that she was experiencing mental symptoms in 2012.

Secondly, the fact that plaintiff was prescribed Cymbalta at some point during the relevant period is not evidence that she had a diagnosis of depression, much less that any such condition rose to the level of a severe impairment. Significantly, Dr. Back's treatment notes from the relevant period, although listing Cymbalta as an active medication, do not include any diagnosis of depression or anxiety.[6] AT 770-72, 773-75. There is no indication of any formal diagnosis of any mental health impairment during the relevant period, and it was not until her treatment with NP LeBlanc after the relevant period that any such diagnoses are documented. I note, moreover, that, as a nurse practitioner, NP LeBlanc was not considered an acceptable medical source under the regulations that apply to this action. *See* 20 C.F.R. § 404.1502(a) (7) (indicating that licensed advanced practice nurses are considered acceptable medical sources only for claims filed on or after March 27, 2017). Because NP LeBlanc was not considered to be an acceptable medical source at the relevant time, her diagnoses

---

[6]    In a treatment record dated February 14, 2013, Dr. Back notes that plaintiff reported that she had recently started to see a psychiatrist and that there had been some changes to her medications as a result, including an increase in her dose of Cymbalta. AT 767. Notably, this is also the first instance in which Dr. Back appears to include a diagnosis of depression in any of his treatment records. AT 769.

provide an insufficient basis for even establishing a medically determinable impairment.  *See Barnaby v. Comm'r of Soc. Sec.*, 17-CV-0399, 2018 WL 4522057, at *4 (N.D.N.Y. June 6, 2018) (Carter, M.J.) (finding diagnoses from two nurse practitioners were insufficient to establish a medically determinable impairment because nurse practitioners were not acceptable medical sources under the former regulations), *aff'd* 773 F. App'x 642, 643 (2d Cir. 2019); *Talbot v. Colvin*, 13-CV-1249, 2015 WL 5512039, at *4 (N.D.N.Y. Sep. 15, 2015) (Suddaby, C.J.) ("Plaintiff failed to prove that he had a diagnosed mental impairment from an acceptable medical source; therefore, his mental impairment cannot be deemed a medically determinable impairment.").  As a result, the diagnoses made by NP LeBlanc cannot, by themselves, constitute evidence of the existence of a severe impairment, whether existing before or after plaintiff's DLI.  I note also that, even though NP LeBlanc listed a number of diagnoses at the start of her treatment with plaintiff, including anxiety, depression, and PTSD, the only mental health diagnosis that Dr. Back records in his treatment notes from February through July of 2013 is depression.  AT 635, 763, 766, 769.  Likewise, Dr. McCrory's later notes at least through December of 2014 – two years after plaintiff's DLI – also list only depression as a mental diagnosis.  *See, e.g,* AT 740, 745, 749, 754, 759.

17

As a result, the only psychological diagnosis that has seemingly been endorsed by an acceptable medical source – and that therefore can be considered evidence of a medically determinable impairment – that could be remotely applicable to the relevant period is depression, and the first notation of that diagnosis was still made after plaintiff's DLI.[7]

Even if Cymbalta was prescribed by Dr. Back to treat depression prior to documentation of a diagnosis, the treatment notes from the relevant period still do not document any psychiatric complaints, which suggests that, while taking Cymbalta, plaintiff's depression was controlled and she was not experiencing symptoms. The mere fact that a plaintiff has a diagnosis or is receiving treatment for an impairment does not invariably lead to a conclusion that the plaintiff suffers from functional effects, where the evidence does not support such functional effects. *See Talbot*, 2015 WL 5512039, at *4 (noting that "[t]he mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment, is not, itself, sufficient to deem a condition severe"). Similarly, the fact that plaintiff had been prescribed other psychiatric medications at an unspecified time in the past does not lead to

---

[7]     I acknowledge that the ALJ nonetheless found that, in addition to depression, plaintiff had medically determinable impairments of anxiety and PTSD during the relevant period. AT 13.

a conclusion that her mental impairments were severe at the relevant time without evidence that she was experiencing symptoms during that relevant time. Because the records do not document any deficits or abnormalities in plaintiff's mental functioning during the relevant time period, whether she was taking some medication for mental impairments either before or during the relevant period is insufficient, by itself, to suggest error in the ALJ's finding that those mental impairments were not severe during the relevant period.

Because plaintiff has not pointed to any evidence that corroborates her allegations that she was suffering from mental health limitations that impacted her ability to work before her DLI, I recommend that the ALJ's finding that those mental impairments were nonsevere be affirmed.

### 2. The ALJ's Assessment of the Opinion Evidence

Plaintiff also challenges the ALJ's weighing of the opinions from NP Tammy LeBlanc, Dr. KrisEmily McCrory, Dr. Paul Spurgas, and Dr. Arthur Lorber for various particular reasons, and tangentially argues, as a general matter, both that (1) the ALJ was not allowed to disagree with any of these physicians' assessments of their own treatment records because doing so amounts to improperly substituting his own lay interpretation of medical records for that of medical sources, and (2) the ALJ was required to adopt

their various opinions because there were no opinions contradicting them.
Dkt. No. 14, at 38-45.  Neither of these arguments is consistent with the
prevailing law.

As to plaintiff's first argument, it is well established that there is a
distinction between an ALJ's considering and assessing treatment
evidence in the record, when determining what the weight of the evidence
supports, and an ALJ's interpreting raw medical data that requires the
expertise of a physician.  *See Cristina M. v. Saul*, 18-CV-0332, 2019 WL
3321891, at *6 (N.D.N.Y. July 24, 2019) (Hummel, M.J.) ("There is a
difference between analyzing medical records to determine what the weight
of the evidence supports and interpreting raw medical data that would
require the expertise of a physician or other trained medical source; the
ALJ is precluded from doing only the latter."); *see also Nicole R.T. v.
Comm'r of Soc. Sec.*, 20-CV-1015, 2022 WL 866551, at *6 (N.D.N.Y. Mar.
23, 2022) (Peebles, M.J.) (noting that "[a]n ALJ is not required to accept a
physician's after-the-fact statement regarding the severity of the findings in
his treatment notes where a review of those same treatment notes clearly
does not support the physician's statements").  Plaintiff broadly asserts that
the ALJ's findings that the various opinions were inconsistent with the
evidence in the record represents an impermissible interpretation of raw

medical data, yet ignores that the ALJ did no such thing here.  Notably, the

ALJ did not substitute his own interpretation of objective imaging or testing,

such as MRIs or EMGs, or other such medical data for that of a physician.

Rather, he reviewed the medical evidence, including observations of

plaintiff's range of motion, grip strength, and reports of efficacy of treatment

and assessed whether such observations and other evidence reasonably

suggested that plaintiff was as limited as the medical sources opined.  The

ALJ's actions were therefore appropriate and well within his authority under

the regulations.  Plaintiff's argument, if accepted, would in effect preclude

an ALJ from assessing whether a medical source's opinion is consistent

with the evidence or supported by that source's own treatment notes,

something which is clearly contradictory to the direction in 20 C.F.R. §

404.1527 to consider such factors when weighing opinion evidence.  An

ALJ is not required to defer to an opinion, even an opinion from a treating

source, if a reasoned assessment of the evidence in the record reveals that

such opinion is not consistent with and supported by the relevant evidence

in the record.

Secondly, the ALJ was not required to adopt the opinions of these

sources where the record did not support them merely because no source

offered a contrary opinion.  The Second Circuit has recognized that an ALJ

is entitled to formulate an RFC finding without relying on any opinion, so long as the evidence in the record is sufficient to allow him or her to do so. *See Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013). Indeed, in *Monroe* in particular, the Second Circuit made clear that the ALJ may rely on a treating source's treatment notes to formulate the RFC even where he or she has rejected that same source's medical opinion. *Monroe*, 676 F. App'x at 8-9. As will be discussed below with regard to the individual opinions, the ALJ provided explanations as to why each of those opinions was not supported by the source's own treatment notes or explanations and was not consistent with the relevant evidence as a whole.

a.   <u>NP Tammy LeBlanc</u>

Regarding NP LeBlanc's opinion, the ALJ did not commit any error in finding her conclusions were entitled to little weight. The ALJ afforded her opinion little weight because the limitations contained within it "do not reflect a specific period" and are not consistent with the treatment notes that show "no referral for a higher level of care or any hospitalizations for mental health conditions," and because NP LeBlanc did not start treating plaintiff until after her DLI. AT 18. I note that, because NP LeBlanc is not an acceptable medical source, as was already discussed above, the ALJ

22

was not required under the former regulations to provide a detailed

rationale for the weight afforded to her opinion.  Those regulations state

that, although opinions from such sources will be considered by the ALJ

using the same factors as for acceptable medical sources, "not every factor

for weighing opinion evidence will apply in every case," and the ALJ is

required only to explain the weight given to those sources "or otherwise

ensure that the discussion of the evidence in the determination or decision

allows a claimant or subsequent reviewer to follow the adjudicator's

reasoning, when such opinions may have an effect on the outcome of the

case."  20 C.F.R. § 404.1527(f)(1)-(2).  Notably, the opinions of sources

who are not acceptable medical sources are not entitled to controlling

weight under the former regulations.  *Natasha D. v. Comm'r of Soc. Sec.*,

19-CV-0515, 2020 WL 1862966, at *7 (N.D.N.Y. Apr. 13, 2020) (Baxter,

M.J.).

Plaintiff acknowledges that NP LeBlanc's opinion does not include

any specification of the time period to which it applies, and that NP LeBlanc

did not begin treating plaintiff until at least a month after her DLI, but argues

that the Commissioner is not permitted to merely assume that the

limitations in that opinion were not intended to apply to the earlier period.

Dkt. No. 21, at 5.  However, in the absence of any statement by NP

LeBlanc to the effect that the opined limitations predate her treatment with plaintiff, and, most importantly, in the absence of any medical evidence corroborating mental impairments or symptoms prior to plaintiff's DLI, the ALJ's citation to the fact that the opinion does not reflect a specific period is reasonable as an explanation for why he afforded it little weight as to the relevant period at issue.  The ALJ also properly noted that the record, both during the relevant period and during the time of NP LeBlanc's treatment, did not show findings consistent with the limitations contained in her opinion.  Lastly, the ALJ properly highlighted that NP LeBlanc did not treat plaintiff during the relevant period, something which indicates she would have had very little insight into plaintiff's functioning during that time other than through plaintiff's own self-reports.  In sum, the ALJ provided valid reasons for affording NP LeBlanc's opinion little weight, and it is clear from the decision as a whole that the ALJ properly considered that opinion.

### b.    Dr. KrisEmily McCrory and Dr. Paul Spurgas

Plaintiff next argues that the ALJ failed to properly assess the opinion of Dr. McCrory, which Dr. Spurgas later endorsed.  In a form dated February 19, 2016, Dr. McCrory opined that plaintiff is able to lift and carry only five pounds, stand or walk for less than two hours in an eight-hour workday, sit for less than two hours in an eight-hour workday, frequently

finger, occasionally kneel, crouch, crawl, stoop, reach, and handle, and never climb or balance.  AT 641-42.  Dr. McCrory further opined that plaintiff has pain that would cause her to be off-task for at least fifty percent of the workday.  AT 642.  She also opined that these restrictions have been present since before December 31, 2012, an assessment which she indicated was based on "notes from Dr. Spurgas' office, [and] review of imaging from 1/2012 through 7/2012."  *Id.*  On December 16, 2016, Dr. Spurgas checked boxes indicating that he agreed with the limitations in that opinion form, and that the limitations in that form were "reasonably consistent with [plaintiff's] symptoms and the medical signs and findings of her impairments."  AT 776.

The ALJ afforded those opinions little weight, stating that (1) "they are not specific as to any timeframe for the assessed limitations," (2) the limitations regarding lifting, carrying, sitting, standing and walking are inconsistent with the treatment notes and clinical findings from before plaintiff's DLI, and (3) Dr. Spurgas does not provide any explanation for agreeing with these findings, and his own treatment notes do not support limitations in sitting or standing in particular during the relevant period.  AT 18.

I agree with plaintiff that the ALJ's notation that the opinion was not

specific regarding the timeframe for the assessed limitations is contradicted by the form on which the opinion was rendered, in which Dr. McCrory clearly notes that the limitations specified were present prior to December 30, 2012, an opinion which she based on her review of Dr. Spurgas' records, including imaging from the first half of 2012. AT 642. It is therefore not ambiguous that Dr. McCrory, and by extension Dr. Spurgas, opined that the limitations noted had existed throughout 2012 and up to at least the date of Dr. McCrory's opinion. Accordingly, that articulated reason does not constitute a proper basis for affording little weight to the opinion.

The ALJ did not, however, rely solely on his finding regarding the applicable timeframe in discounting the opinion, but instead additionally stated that the exertional limitations in that opinion are not consistent with the evidence applicable to the relevant period, and that Dr. Spurgas provided no explanation as to why he was endorsing Dr. McCrory's opinions, particularly in light of the fact that his own treatment notes from the relevant period did not support that opinion. These statements constitute good reasons for the ALJ's choice to afford little weight to those opinions.

Plaintiff's arguments to the contrary center around three main

assertions: (1) the ALJ was not permitted to assess the treatment evidence in a way that was contrary to the interpretation of the treating physicians; (2) notwithstanding, the record is consistent with and supports the limitations opined by Dr. McCrory and Dr. Spurgas; and (3) the ALJ should have afforded these sources controlling or great weight based on their treatment relationship, credentials, and specialties.  Dkt. No. 14, at 38-45.

The first of these assertions I have already addressed above, and found to be unpersuasive and inconsistent with the applicable legal standards.  As to the second assertion, plaintiff's argument primarily represents a request for this court to reweigh the evidence in a way that is more favorable to her, something which is not the function of this court.  *See Sandra W. v. Comm'r of Soc. Sec.*, 21-CV-0599, 2022 WL 1115404, at *4 (N.D.N.Y. Apr. 14, 2022) (Stewart, M.J.) (collecting cases).  Of note, plaintiff cites to physical therapy notes mostly involving her subjective reports of symptoms, as well as some objective notations of impaired cervical, lumbar, and shoulder range of motion.  Dkt. No 14, at 43.  Plaintiff additionally recounts selections from Dr. Spurgas' notes and from treatment records that are well beyond the expiration of the relevant period.  *Id.* at 43-44.  In any event, the fact that those treatment notes showed some abnormalities and ongoing symptoms did not require the ALJ to accept the

disabling limitations opined by the treating physicians.  Specifically, the ALJ

discussed the treatment evidence from both during and after the relevant

time period, recognizing that plaintiff had some improvement in her

symptoms following her cervical spine surgery, and that she had no

treatment for that impairment between July 2012 and October 2013.  AT

16-17.

The relevant evidence provides substantial support for the ALJ's

finding that plaintiff did not have the limitations outlined in the treating

physicians' opinions prior to plaintiff's DLI.  Plaintiff reported to Dr. Spurgas

on February 13, 2012, that she had pain in her neck that was interfering

with her ability to do any type of daily activities; despite those reports, Dr.

Spurgas recommended maximizing conservative treatment therapies

before considering surgery, but plaintiff was "interested only in surgery."

AT 578-79.  Two months post-surgery, plaintiff reported that she was doing

well with reduced headaches, decreased numbness in her upper

extremities, and decreased discomfort than prior to surgery, and she was

observed to have good upper extremity strength and good range of motion.

AT 576.  In May of 2012, plaintiff reported that she had been able to

steadily expand her activities at home to do laundry and some housework;

the physical examination revealed good grip strength, good upper extremity

strength and range of motion, improved range of motion in her cervical

spine, and no sensory deficits, although there was some residual tightness

in her upper trapezius and cervical paraspinal muscles.  AT 575.  The

following month, plaintiff reported feeling overall improved and that physical

therapy was getting easier, although she did report experiencing some

posterior neck discomfort.  AT 574.  Dr. Spurgas observed that plaintiff had

good upper extremity strength and range of motion, improved range of

motion of the cervical spine, improved – although still limited – flexion,

extension, and lateral bending of the neck, and tenderness in her upper

trapezius and cervical paraspinal muscles, although that was less than on

the previous visit.  AT 574.  In July 2012, plaintiff reported some more

minor improvement, although she had exacerbated her pain after lifting a

thirty pound bag of cat litter; Dr. Spurgas noted that an x-ray showed no

instability or abnormal motion at the fused site of her cervical spine,

advised her to continue her current treatment, and observed that she had

normal upper extremity strength other than a slight decrease in grip

strength in her right hand, good extremity range of motion, and significantly

restricted range of motion in her cervical spine due to a combination of

muscular tightness and spasming and plaintiff's fear that she would hurt

herself.  AT 573.

In addition to Dr. Spurgas' records, the only other apparent treatment prior to plaintiff's DLI was with Dr. Back in November of 2012, at which time plaintiff reported neck pain and a concern about personality change from the Lyrica she was taking for that pain.  AT 773.  The only observation Dr. Back noted during this examination was that plaintiff had tenderness on the left side of her neck with no deformity.  AT 774.  The record further contains notations regarding the course of plaintiff's physical therapy treatment, which also fail to corroborate the significant restrictions opined by the treating physicians.  An evaluation dated April 4, 2012, which was approximately a month after plaintiff's surgery, reflects that she predictably had fairly decreased range of motion in her neck at that time, only slightly diminished shoulder range of motion for select motions, mildly decreased sensation to sharp touch in her hands, only slightly diminished strengths with a slightly diminished right grip strength, normal reflexes, and no noted gait issues; the provider also noted that plaintiff had moderate to severe restriction in her neck due to recent surgery and her fear of moving her neck.  AT 820-21.

As the ALJ found, these records as a whole do not corroborate any limitations in plaintiff's abilities to sit, stand, or walk, and also do not support that plaintiff can lift no more than five pounds.  Dr. Spurgas and the

physical therapist noted that plaintiff had normal or only slightly diminished

strength in her upper extremities, and acknowledged that some of plaintiff's

perceived restriction related to her neck was due to her fear of hurting

herself.  Although the records show that plaintiff did experience an

exacerbation of pain from lifting a bag of cat litter in July of 2012, it was

uniformly acknowledged that the bag weighed thirty pounds, which is far

heavier than is required by the ALJ's RFC finding, and which does not

suggest plaintiff was limited to lifting only five pounds.  Further, as to

limitations related to reaching and handling in the treating physicians'

opinions that are inconsistent with those included in the RFC finding, the

record supports the ALJ's rejection of those limitations, particularly

evidence related to a generally normal range of motion in plaintiff's upper

extremities and generally normal or only slightly diminished sensation and

grip strength in her right hand.  After a careful consideration of the

evidence, which was clearly discussed and considered in his decision, I

find that the ALJ's assessment of the evidence as being inconsistent with

the various exertional limitations included in the treating physicians'

opinions is supported by substantial evidence and provides a good reason

for declining to afford those sources' opinions greater weight.

Lastly, even under the auspices of the treating physician rule, an ALJ

31

is not required to afford controlling or even any weight to an opinion from a treating physician merely because that physician had a treating relationship and specialty in an area of practice.  *See Orts v. Astrue*, 11-CV-0512, 2012 WL 6803588, at *11 n.16 (N.D.N.Y. Nov. 14, 2012) (Hines, M.J.) (citing Second Circuit cases standing for the proposition that an ALJ may properly afford a treating physician's opinion no weight so long as good reasons exist to do so).  Although in this instance the ALJ does not specifically discuss the details of the treating relationships or the specialties of either Dr. McCrory or Dr. Spurgas in the decision, he does address in some detail Dr. Spurgas' treatment notes from the relevant period, thereby indicating that he was aware that Dr. Spurgas had a treating relationship with the plaintiff.  I note further that, although Dr. McCrory also had a treating relationship with plaintiff, she did not treat plaintiff during the relevant period and explicitly based her opinion as to the relevant period on a review of the treatment records of Dr. Spurgas, and not on her own knowledge or relationship with plaintiff.  Because Dr. McCrory made clear that she did not rely on her own relationship with plaintiff as to her functioning during the period prior to her DLI, I find any failure of the ALJ to more explicitly address the treating relationship of Dr. McCrory to be harmless error at best.  Further, as was discussed above, under the prevailing law, although

the failure to address every factor required by the treating physician rule

constitutes a procedural error, such error is harmless if, based upon a full

reading of his or her decision, it is clear that the ALJ did not traverse the

substance of the treating physician rule.  *Estrella*, 925 F.3d at 96.  Because

the ALJ appropriately considered specifically whether the treating

physicians' opinions are consistent with the evidence from the relevant time

period, including specifically the treatment records of Dr. Spurgas that

constitute the bulk of that relevant evidence, I recommend a finding that the

ALJ did not violate the treating physician rule, because it is clear that a

greater explicit consideration of the treating relationships or specialties

would not have undermined the ALJ's overall conclusion that the limitations

opined are not supported by or consistent with the evidence.

### c.   Dr. Arthur Lorber

Although plaintiff makes the argument only tangentially, it is also

necessary to discuss the propriety of the ALJ's rejection of nonexamining

medical expert Dr. Lorber's opinion that plaintiff met Listing 1.04 from

March 8, 2012, until March 17, 2013.  I note that the ALJ was not required

to afford any special significance or deference to such opinion, as it

represents an opinion on an issue reserved to the Commissioner.  *See* 20

C.F.R. § 404.1527(d)(2)-(3) (noting that, although opinions from medical

sources about whether a claimant meets or equals the requirements of the

Listing of Impairments should be considered, "the final responsibility for

deciding these issues is reserved to the Commissioner").  The ALJ

explicitly considered Dr. Lorber's opinion in this respect, finding that it

merited little weight because it was based on an incomplete record and "the

diagnostic and clinical findings do not show evidence of disabling

conditions beyond July 2012."  AT 15.  I find the ALJ's rejection of this

opinion, and his listing finding at step three in general, to be supported by

substantial evidence.  Notably, the record does not reveal evidence to

indicate that plaintiff meets all of the relevant criteria of Listing 1.04,

including compromise or compression of a nerve root, neuroanatomic

distribution of pain, or motor loss with sensory or reflex loss.  *See* 20 C.F.R.

§ 404, Subpart P, Appendix 1, at 1.04.  Indeed, Dr. Lorber's own recitation

of the evidence he considered contradicts his opinion that plaintiff meets

the requirements of Listing 1.04.  AT 53-54 (testifying that MRIs showed no

spinal cord compression or nerve root impingement).  As a result, the ALJ's

choice not to rely on Dr. Lorber's opinion regarding whether plaintiff met or

equaled Listing 1.04 during the relevant period is supported by substantial

evidence.[8]

### d.  Dr. Daryl Didio

At oral argument, plaintiff also raised the issue of the ALJ's failure to discuss or weigh the opinion from medical expert Dr. Daryl Didio.  Plaintiff argued in particular that Dr. Didio's opinion substantiates that her mental impairment should have been found to be severe.  At the relevant hearing, and after a review of the record and hearing plaintiff's testimony, Dr. Didio testified that there was no evidence to establish the presence of a medically determinable mental impairment during the period between March 8, 2012, and December 30, 2012.  AT 58-59.  He further testified that records from after that relevant period did show medically determinable impairments of a depressive disorder and a general anxiety disorder.  AT 59.  However, he opined that those impairments were nonetheless not

---

[8]  I note that Dr. Lorber also opined that, after plaintiff's disability ended in March 2013, she possessed the ability to occasionally lift 10 pounds and frequently lift less than ten pounds, stand and walk for 6 hours total and sit 8 hours total, never climb ladders, ropes or scaffolds, occasionally reach overhead, and avoid exposure to concentrated vibration.  AT 55.  The ALJ does not appear to weigh this portion of Dr. Lorber's opinion.  However, any such omission is harmless under the circumstances. First, Dr. Lorber specifically stated that this portion of his opinion applied only as of March 17, 2013, which is outside of the relevant time period.  Further, the ALJ's RFC finding is either entirely consistent with, or more restrictive than, Dr. Lorber's opinion in every respect in terms of the functional limitations, and the evidence, as was discussed above, does not appear to merit any greater limitations.  Because Dr. Lorber's opinion does not describe limitations that would be more favorable to plaintiff than those already included in the RFC, any failure on the part of the ALJ to explicitly discuss the reasons for weight given to that opinion is harmless error at most, as further explanation would not have changed the outcome here.

severe within the meaning of the Social Security regulations, as the records from after 2012 documented no more than mild impairment in the areas of understanding, remembering and applying information, interacting with others, and adapting or managing, and mild-to-moderate impairment in the area of concentrating, persisting and maintaining pace.  AT 60-62.  Dr. Didio further testified that there was no support in the record for the limitations opined by NP LeBlanc.  AT 62.

Although plaintiff is correct that the ALJ does not appear to address or weigh Dr. Didio's opinion, that omission is harmless because consideration of that opinion would not have resulted in a different outcome.  *See Ryan v. Astrue*, 650 F. Supp.2d 207, 217 (N.D.N.Y. 2009) (Kahn, J.) (finding that failure to consider or afford weight to even a treating physician is harmless error when the analysis of weight would not have affected the outcome); *accord Clark v. Berryhill*, 17-CV-0568, 2018 WL 3069207, at *6 (N.D.N.Y. June 21, 2018) (Suddaby, C.J.).  Dr. Didio clearly opined that the record did not establish the existence of a medically determinable mental impairment at any time during the relevant period prior to plaintiff's DLI.  As was already discussed above, there is no evidence of a diagnosis of any mental impairment during the relevant period consistent with Dr. Didio's testimony, much less any treatment for any such

impairment.  As a result, the ALJ's finding that plaintiff did have a medically

determinable mental impairment during the relevant period is actually more

favorable than Dr. Didio's opinion.  To the extent that plaintiff argues that

Dr. Didio's indication of ratings for the "paragraph B" criteria are more

favorable to her than the ALJ's findings, that contention ignores the fact

that such ratings were for the period around or after February of 2013,

when medically determinable impairments were established.  AT 61-62.

Because Dr. Didio's opinion stands for the proposition that there was no

evidence of a mental impairment during the relevant period, his opinion

would not have altered the outcome here, and the ALJ's failure to analyze

his opinion in the decision is harmless error that does not warrant remand.

3.    The ALJ's Assessment of Plaintiff's Subjective Reports

Plaintiff lastly argues that the ALJ failed to properly evaluate her

subjective reports of symptomology experienced due to her impairments.

Dkt. No. 14, at 45-47.  Under the two-step review protocol applicable in

social security cases for assessing a claimant's subjective reports of

symptoms, an ALJ must first determine whether the individual has a

medically determinable impairment that could reasonably be expected to

produce the alleged symptoms, and, if so, the ALJ must then evaluate the

intensity and persistence of those symptoms and determine the extent to

which those symptoms limit the claimant's ability to perform work-related activities. Social Security Ruling ("SSR") 16-3p, 2017 WL 5180304, at *3-8. When addressing this second prong, an ALJ must consider the objective medical evidence and other evidence in the record, including statements by the claimant and reports from both medical and non-medical sources, and must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms, considering relevant factors which include evidence regarding (1) daily activities, (2) the location, duration, frequency, and intensity of pain or other symptoms, (3) factors that precipitate or aggravate the claimant's symptoms, (4) the type, dosage, effectiveness, and side effects of medication, (5) any treatment other than medication that is used to relieve the symptoms, (6) other measures to obtain relief of symptoms, and (7) any other relevant factors. *Id.*

If the ALJ finds that a claimant's subjective testimony should be rejected, he or she must explicitly state the basis for doing so with sufficient particularity to enable a reviewing court to determine whether those reasons for disbelief were legitimate and whether the determination is supported by substantial evidence. *Martone v. Apfel*, 70 F. Supp. 2d 154, 151 (N.D.N.Y. 1999) (citing *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y. 1987)). The ALJ's decision need not contain a discussion of all

of the potentially relevant factors listed above, provided that it is clear from the decision that the ALJ considered all of the evidence and that he or she provided specific reasons for his or her determination as to the intensity, persistence, and limiting effect of the claimant's symptoms.  *See Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (finding that failure to discuss certain factors did not require remand because the ALJ provided specific reasons for his determination "and the record evidence permits us to glean the rationale of the ALJ's decision").  Where the ALJ's findings are supported by substantial evidence, the decision to discount subjective testimony may not be disturbed on court review.  *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).

Plaintiff's argument represents little more than a renewal of the arguments made regarding the ALJ's weighing of the opinion evidence, in which she contested that the ALJ merely summarized and interpreted the medical evidence as a layperson.  *Id.* at 45-46.  Plaintiff also again argues that the record supports an opposite conclusion, which, as was already discussed above, is an inaccurate representation of the record, represents a request to reweigh the evidence in plaintiff's favor, and does not necessarily negate the conclusion that the ALJ's finding is also supported.  *Id.* at 46-47.  Plaintiff's only novel argument is that the ALJ failed to

consider the fact that her decision to undergo surgery supported her credibility of disabling pain.  I note, however, that the ALJ did acknowledge the fact that plaintiff underwent surgery as part of his analysis.  AT 15-16. He also discussed the fact that the surgery in question resulted in some documented improvement in her condition, and also considered her involvement in physical therapy and the fact that she reported taking pain medications, which made her drowsy.  AT 16.  The ALJ also discussed that the medical evidence does not demonstrate significantly limited range of motion, muscle spasms, muscle atrophy, motor weakness, sensory loss, or abnormal reflexes.  AT 16-17.  Although the ALJ concededly did not specifically address all of the relevant factors listed in SSR 16-3p, he considered the ones that were relevant and documented by the record. Because plaintiff has not pointed to any evidence which would suggest that the ALJ failed to apply the appropriate legal standard or to appropriately consider the evidence, I find no reason to reassess the ALJ's finding as to the consistency of plaintiff's subjective reports relevant to the time period at issue.

## IV.   SUMMARY AND RECOMMENDATION

After considering the record as a whole and the issues raised by the plaintiff in support of her challenge to the Commissioner's determination, I

recommend a finding that the determination resulted from the application of proper legal principles and is supported by substantial evidence. Accordingly, it is hereby respectfully

RECOMMENDED that the Commissioner's decision be AFFIRMED, defendant's motion for judgment on the pleadings (Dkt. No. 18) be GRANTED, plaintiff's motion for judgment on the pleadings (Dkt. No. 14) be DENIED, and plaintiff's complaint be DISMISSED.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  <u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated:   August 15, 2022
         Syracuse, NY

DAVID E. PEEBLES
U.S. Magistrate Judge